## STATE v. SANDY SCAVO.[1]

October 24, 1952.

No. 35,841.

E. P. Willcuts, for appellant.

John F. Bonner, City Attorney, and Leo P. McHale, Assistant City Attorney, for the State.

[1]Reported in 55 N. W. (2d) 509.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment of the municipal court finding defendant guilty of violating a vagrancy ordinance of the city of Minneapolis and from an order of the court denying defendant's motion for a new trial, and/or vacating and setting aside the findings, judgment, and sentence therein, and, in lieu thereof, entering a finding of not guilty.

Defendant was convicted on a "tab charge" of vagrancy in the municipal court of Minneapolis and was sentenced to serve 90 days in the workhouse. The charge was that, within the corporate limits of the city of Minneapolis, on January 9, 1952, defendant "did wilfully, unlawfully and wrongfully, without any visible means of support, then and there live idly without lawful employment, and did then and there wander about the streets of said city; and not then and there having any known place of residence or abode, and was then and there found traveling about said city begging for the purpose of gain; and was then and there loitering about saloons, gambling resorts and houses of ill-fame, without giving a good account of his conduct, contrary to the provisions of an ordinance passed by the city council of the city of Minneapolis * * *."

It is undisputed that the ordinance involved is Minneapolis City Charter and Ordinances (Perm. ed.) 37:37. Section 1 of the ordinance provides:

"Any male or female person found within the limits of the City of Minneapolis, who has no visible means of support, or who lives idly without lawful employment, or who wanders about the streets either by day or night; or any person who does not have a known place of residence or abode, or is found begging, or who for the purpose of gain, travels about over the city, begging, or who loiters about saloons, gambling resorts or houses of ill-fame, or is found trespassing on private premises, without giving a good account to the court for his or her conduct, * * *."

Defendant assigns as error: (1) That the trial court erred in not granting his motion for dismissal at the close of the state's case; (2) that the finding of guilty and the judgment of the trial court

are not justified by the evidence and are contrary to law; and (3) that the trial court erred in denying defendant's motion for an order vacating the findings, judgment, and sentence or, in the alternative, granting a new trial.

It appears that no claim has been made and no evidence produced to show that defendant ever begged, trespassed upon private premises, or frequented houses of ill fame. Therefore, it appears that, if he is guilty, it will have to be under those portions of the ordinance relating to idleness and lack of visible means of support, wandering about the streets day or night, not having any known place of residence, or loitering about saloons and gambling resorts.

The state produced seven witnesses. We have examined their testimony carefully. Two of these witnesses were police officers Carl Pearson and Walter Dolmseth who testified that they saw defendant about 9:30 in the evening of January 3, 1952, driving a car on a street in Minneapolis; that he was accompanied by two other men; that defendant had no gun on him; and that he stated that he had been out of work for two weeks. It appeared that the business where he had been employed in St. Paul had been sold. Neither of these witnesses had ever seen defendant before that evening.

Eugene Bernath, a detective who had been a police officer for 25 years, testified that he had known defendant for about 15 years and had not known of his working since the latter was about 18 years old. He admitted that he had not seen defendant around town during the six months previous to the trial and had not observed him in any bars or night clubs recently.

Another witness for the state, Samuel Hurwitz, testified that he lived in Baltimore, Maryland; that he had been in Minneapolis four or five weeks; that he had registered at a hotel under an assumed name; that he met defendant one time in a Minneapolis restaurant; and that defendant had given him a telephone number. He said that defendant was sober at the time and that that was the only time he had met him.

James M. Chacos, a partner in a Minneapolis cafe which had no liquor license, testified in behalf of the state that he saw defendant in the early morning of December 27, 1951, in his cafe; that after some discussion, during which defendant became a bit belligerent, Chacos and his partner ordered or pushed defendant out of their place of business, at which time defendant muttered something about squaring matters for a friend; and that shortly afterward some shots were fired and damage was done to a car standing in the rear of the cafe belonging to Chacos or his partner. Chacos testified, however, that he observed no gun in the possession of defendant at the times involved and that from information he had received the shots were apparently fired from a 1937 Ford car, whereas it appears from the record that defendant owned a 1949 Plymouth.

Richard H. Miller, the arresting officer, testified that on January 9, 1952, in the company of another officer and pursuant to instructions of a superior, he went to defendant's home at 3616 Nicollet avenue, Minneapolis, and brought him into police headquarters, where he was "booked" and turned over to an inspector. When asked if his superior had told him to go out and arrest defendant, Miller replied that he was told to go out and bring him in for questioning. Miller admitted that he had no warrant to enter defendant's home for his arrest; that he and his companion officer were not freely admitted to the home; and that when asked to show by what warrant or authority they were entering the house he said "this was the warrant" and showed his detective's badge. The officer further testified that at the time he found defendant in his home the latter was doing nothing that he would consider illegal, "with the exception that he wasn't working"; that within the four months prior to January 9, 1952, he had seen defendant "in various night spots," in at least one of which liquor was sold; and that defendant was not working.

Charles Wetherille, inspector of detectives, testified that he had ordered defendant brought in for questioning on January 9, 1952; that he had known defendant "professionally" for two or three years; that he did not talk to defendant at the particular time he

was brought in for questioning on January 9, but that he had talked to him on previous occasions, once shortly after June 25, 1951, when he questioned defendant about some men who were captured on that date in connection with a "holdup" at an oil company's place of business; that he had asked defendant whether these men were staying at his home; and that defendant neither admitted nor denied that they were. Wetherille said that during the six months previous to the trial he had seen defendant going to and from his home on different occasions; that he had followed him two or three times, once to the oil station of defendant's father on the east side, once to the state capitol, and possibly once when defendant stopped at a restaurant; that otherwise he had not seen him around any place; and that he did not know whether defendant was working on January 9, the day he ordered him brought in for questioning, since he had not talked to him that day. He concluded by saying that he had not seen defendant at any time within six months previous to the trial on January 16, 1952.

While defendant did not appear in his own behalf, other witnesses appeared for him. His wife, June Scavo, testified that she and defendant lived at 3616 Nicollet avenue in a residence owned by her mother; that they had lived there for two years; that they paid no rent, but had all their expenses paid and received $20 a month for taking care of the house; that they rented some of the upstairs rooms to girls; that defendant maintained the yard and did some painting, papering, and small plumbing work around the property; and that during the six months prior to the trial defendant worked or was a partner at his father's filling station on East Hennepin avenue. She said that defendant owned an automobile; that he had worked at a bar in St. Paul within six or seven months previous to the trial, but was laid off when the owner sold that place of business; that defendant did not stay out late at night; that the relationship between them was pleasant; and that no divorce proceedings were pending. She also said that defendant worked from seven o'clock in the morning until about eight o'clock in the evening seven days a week for about two months shortly prior to the time of

the trial. When shown photographs of two men, she denied that they had ever stayed at the home of herself and her husband. She explained that defendant had been in the service; that he received a monthly disability check of $15 on the first of every month; that he was released from the service in 1945; that they had been married two years; and that he had worked in the bar in St. Paul for about ten months, part of which time was during the calendar year 1951.

Mrs. Scavo's mother, Ruth Gynn, also testified that she knew that defendant had worked for a time at his father's oil station and that he had worked for a time at a tavern in St. Paul.

Defendant's father, Sandy Scavo, Sr., explained that he took defendant in as a partner in his oil station and that he worked there when he could work but that defendant was not able to work at all times because of a nervous condition and because his hand bothered him. He testified that his son received the Bronze Star in connection with his war service; that the boy had not been the same since he returned from service; and that he was very nervous.

It is the position of the state that the evidence is sufficient to sustain the judgment of the court in finding defendant guilty of vagrancy, that it was a question of fact, and that the court believed the police officers rather than the story presented by defendant's witnesses.

We have carefully examined the testimony and the law involved in the case before us. While the record does not offer all that might be desired with reference to the employment activities of defendant, it is our opinion that the judgment of conviction by the trial court is not justified by the evidence. It is apparent here that the police and detective department "had their eyes on" defendant for some time and did not approve of some of his conduct or the company he kept from time to time. We realize that the police department must be given certain latitude, in order to apprehend suspicious characters, in connection with their police duties. However, we feel here that the evidence was insufficient to sustain a conviction on the charge of vagrancy under the ordinance. It is our

opinion that the judgment of the court should be reversed and defendant discharged.

Reversed.